UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
KARINE GEVORKYAN, ARTHUR BOGORAZ,
INNA MOLDAVER and SAM MOLDAVER,

                        Plaintiffs,                Case No. 13 civ 8383

    -against-

IRA JUDELSON,

                        Defendant.
-------------------------------------------------------------X

### AFFIDAVIT OF KARINE GEVORKYAN
### FOR SUBMISSION ON BENCH TRIAL

KARINE GEVORKYAN, being duly sworn, says and deposes:

1. I offer this affidavit as my direct testimony in the bench trial of this case.

2. ARTHUR BOGORAZ is my husband. We were married on October 10, 2010. We have one son.

3. I am 31 years of age. I was born in 1983.

4. I graduated Midwood High School in Brooklyn, New York in 2000.

5. I attended City College, which is an affiliate of Sheffield University in England. I attended at their Greece campus from 2005-2007. I graduated that school and earned my Masters Degree in banking and finances.

6. I am presently attending Pace Law School and am in the middle of second year.

7. In the interim, I was employed by ADH Health in Congers, New York, as well as for a law firm in Manhattan.

8. My husband is Arthur Bogoraz. He was arrested on criminal charges and sought bail. In

order to obtain bail security to file with the Court, he and I sought a bail bondsman and attempted to prepare a bail application package in order to obtain his release from custody on bail.

9. My husband and I resided in, were citizens of and were domiciled in Edison, in the State of New Jersey. He voted and paid taxes in New Jersey. He lived with me and our children in New Jersey. He intended to remain and live in New Jersey, and is today not in New Jersey solely because of his incarceration. He intends to return to New Jersey as soon as he is released from custody, and intends to continue to be domiciled in, reside in and be a citizen of New Jersey as soon as he is permitted to leave the State of New York. He intends to return to and remain in New Jersey permanently thereafter.

10. INNA MOLDAVER resides in, is domiciled in and is a citizen of New Jersey. She is related to me. She is a good friend of my family.

11. SAM MOLDAVER resides in, is domiciled in and is a citizen of New Jersey. He is related to me. He is also a good friend of my family.

12. When I met Arthur Bogoraz, his work was managing a law firm.

13. He was arrested in St. Martin by US agents, and extradited to the U.S. He was eventually brought to New York.

14. He was arraigned in Kings County and later indicted. He was then arraigned on the indictment in Supreme Court, Kings County.

15. Bail was set at $2 Million dollars. A bail surety hearing was requested by the prosecutor.

16. The case was prosecuted by the Attorney General of the State of New York.

17. In order to secure the bail bond, I contacted many bail bond companies.

18. The first company with whom I had any substantial discussions was Empire Bail Bond.

19. I spoke on the phone and in person with them concerning my husband's case. I met with two people, named Jason and Michelle at their downtown office. We discussed the substance of my husband's case. My husband's parents attended the meeting. They are Galina and Fred Bogoraz.

20. At the Empire Bail Bond meeting we discussed fees and what would be required in order to obtain a bond for my husband in the amount of $2 million. The discussion included collateral for the bond. In this case, collateral would consist of real property which would be pledged for the bond. We discussed how many different properties would be needed, and we discussed what value in real estate properties would be needed

21. Jason and Michelle told me that the fees for a bail bond are standard in New York, and were established by various statutes in the law. They told me that if the defendant gets out of jail, then the fee cannot be returned. The specifically conditioned collection of the fee, which in this case means earning the fee, would only happen if the defendant gets out of jail because of the bail bond.

22. One or both of Jason and Michelle told me that the bail bond premium fee would be returned to me if my husband did not get out of jail because of the bail bond. I was told that I would not be charged any money, or that the money I paid for the bail bond premium would be returned to me of my husband was not released from jail.

23. We discussed that the premium fee for the bond would be returned if Arthur Bogoraz was not released from custody. This conversation took place on multiple occasions.

24. Various persons who were willing to pledge their real properties to secure the bail bond came to the Empire offices and signed documentation from Empire Bail Bonds. The documentation concerned the bail bond for Arthur Bogoraz and his potential bail for the

arrest and case for which he was in custody. Money was given to Empire as a deposit on the bond premium.

25. Empire later decided not to write the bond. They returned the entire portion of the deposit on the bond premium.

26. I met with representatives of the Universal Bail Bond Company. Other persons who were willing to pledge their real property as security also met with that representative.

27. A bail bond deposit was given to Universal Bail Bond in the amount of $ 120,560 as a bond premium payment.

28. We were told that the representative of Universal Bail Bond could not find an insurance company to write the full bond for $ 2 Million.

29. Universal repaid the entire amount of the premium payment to Inna and Sam Moldaver.

30. I next spoke with Defendant Ira Judelson.

31. Ira Judelson and his company prepared and filed a prior bail bond for Arthur Bogoraz.

32. Judelson inquired into the amount of the bail, asked about the sureties, asked about the real property to be pledged and asked whether a hearing on the sureties was to take place.

33. We discussed pledging of real property in Edison, N.J., Arthur's parents' hose, the house of Inna and Sam Moldaver, my parent's house and two separate properties of Yakov and Rita Gittleman.

34. Appraisals were performed and the reports were given to Ira Judelson.

35. Several face to face meetings occurred between Judelson and the sureties.

36. One of the meetings took place in Newark, N.J. at the offices of AIA Insurance Company.

37. At that meeting additional persons who were willing to give personal guarantees were

also present. They included Julie and Eugene Iakunin. A female representative of AIA was present

38. While we discussed what might happen if Arthur was bailed out and did not return to court, there was no discussion of how the bond might be "posted" or how the surety examination might happen.

39. On a different occasion Ira Judelson explained that a surety hearing was a formal procedure where the court looks at all the sureties to make sure they are hard working people and that there is no illegitimate money involved.

40. The bond premium payment was made to Ira Judelson and/or Judelson Bail Bonds during March of 2012 at his Manhattan office. Payment was for the full amount of the bail bond premium of $ 120,560.

41. Payment was in the form of a check from Inna and Sam Moldaver.

42. Ira Judelson led me to believe that the bond was issued once the defendant was released from court. He repeatedly said that once Arthur was released he would start to incur a great risk, and that the $ 120,560 would compensate him for the risk that he took. He said that he had to have the bond premium in his hands before he did anything else.

43. He never said to me that if the surety hearing fails, if the surety was not granted, or if the Court would not accept the sureties, that we would lose the bond premium fee. Instead, he portrayed the bail source hearing as just a formality.

44. He never said to me that once the "bond is tendered to the court and signed by the court, you don't get your fee back."

45. Eventually a bond surety hearing was held in Supreme Court, Kings County. The Attorney General of New York State was the prosecuting agency, and my husband was

represented by counsel. Inna and Sam Moldaver, my parents, Arthurs parents and Yakov and Rita Gittelman all testified at the hearing. Ira Judelson also testified at the hearing. I believe that the hearing lasted two days.

46. Eventually Judge Neil Firetog ordered that surety was not granted.

47. After the denial by Judge Firetog, we hired a new attorney and tried again.

48. We were told by Judelson that we needed to provide extra documentation to the Court to show that the witnesses or the sureties were credible. He advised that Arthur's parents were not good witnesses, and that someone else should substitute for them, or that additional properties should be offered.

49. It appears from the hearing that Judge Firetog said the bond was defective because Ira failed to include one of the properties on the bond and he asked that Ira issue a new bond, which was not done.

50. No fee was demanded for the issuance of a second bond for use in the second hearing.

51. We hired a forensic account at the attorney's request, to go through all the sureties and their paperwork to show that the source of their funds was legitimate.

52. An unsuccessful appeal was taken to the Appellate Division of the Second Department.

53. Judelson tried to resubmit the bond with additional sureties. No new fee was demanded.

54. An application was made to Judge Chun for a new hearing, or to reconsider the denial of surety along with the presentation of additional sureties. He would not consider the application.

55. My husband never left jail, and was always in the custody of the State of New York.

56. He was never released on bail, nor was he released on his own recognizance.

57. He pled guilty to certain offenses in August, 2013 without ever being granted bail,

without leaving the custody of New York State and without having the benefit of a bail bond.

58. A demand was made for the return of the bail bond premium fee.

59. Ira Judelson refused to return any portion of the bail bond premium fee.

60. We offered to compromise, and to compensate his for time expended by him. He refused to refund any portion of the fee.

61. To date, no portion of the fee has been refunded or returned.

62. My husband is currently incarcerated in the Green Correctional Facility in Coxsackie, New York. He has been continuously incarcerated since his arrest.

63. I signed a number of documents and/or obtained a number of documents set forth in the pre-trial order. They include:

    a. Empire Bonding Agency receipt 52507

    b. Judelson Premium Receipt 054586

    c. Judelson Collateral Receipt 027057

    d. Undertaking of Bail dated 3/28/12

    e. Bail Affidavit dated 3/28/12 (multiple pages)

    f. Application and Indemnity for Bail Bond dated 3/28/12

    g. Bail Affidavit dated April, 2012 (multiple pages)

    h. Allegheny Casualty International Fidelity Associated Bond Invoice dated 3/20/12

    i. Letter dated August 5, 2013 from James D. Portman to Aaron M. Rubin, Esq.

64. I offer this affidavit as my testimony.

_____
KARINE GEVORKYAN

Sworn to before me this 12 day of January, 2015

_____
Notary Public

MELISSA HERNANDEZ
Notary Public
State of New Jersey
My Commission Expires Dec. 18, 2018
I.D.# 2441496