UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
KARINE  GEVORKYAN ,ARTHUR BOGORAZ,
INNA MOLDAVER and SAM MOLDAVER,

                             Plaintiffs,                    Case No. 13 civ 8383

      -against-


IRA JUDELSON,
                       Defendant..
------------------------------------------------------------X

## PLAINTIFF'S POST-TRIAL
## BRIEF and PROPOSED FINDINGS
## OF FACT and LAW


      Plaintiffs submit this Post-Trial Brief in support of its proofs.  The proofs at this trial

consist of the direct affidavit testimony and cross-examination, coupled with the exhibits at trial.

Plaintiff produced three witnesses, Karine Gevorkyan, Inna Moldaver and Sam Moldaver.

Arthur Bogoraz was unavailable for cross-examination such that he could not offer an affidvit

on direct examination.  Annexed to this Brief are 9 exhibits utilized in the trial.

      Defendants produced the testimony of Ira Judelson and Yousef Jabr.

      Direct examination of all witnesses revealed the following:

      Defendant JUDELSON ("Judelson") offers Bail and/or Bail Bondsman services within

this district.   Plaintiff ARTHUR BOGORAZ, ["Bogoraz"] is an individual who was arrested on

criminal charges and sought bail.  In order to obtain a bail bond to file with the Court, he and his

wife, KARINE GEVORKYAN ("Gevorkyan") sought a bail bondsman and attempted to prepare

a bail application package in order to obtain the release from custody of Arthur Bogoraz on bail.

1

Bogoraz was arrested on state law charges in Kings County, New York.  He was later indicted in Kings County, New York.  He sought bail and release.  The amount of bail and conditions of bail were set by the Court.  Bogoraz and Gevorkyan approached Judelson, who is a licensed bail bondsman in New York in order to obtain a Bail Bond in lieu of cash to satisfy the terms set by the arraignment judge.

Bail was set by Supreme Court, Kings County at $2,000,000.  This required a bail bond of the same amount.   Plaintiffs obtained the promise of a bail bond from Judelson, which promise was underwritten by insurance companies International Fidelity Insurance Company and Allegheny Casualty International Fidelity Associated Bond who regularly provide bail bond backing and servicing to Defendant. Defendant is their Attorney in Fact and their Agent.

Plaintiff Gevorkyan paid a bail bond premium of $ 120,560[1] on March 27, 2012 which was payment for the premium upon a promised bail bond to be filed with the Court if accepted by the Court. Her name, and her name alone is found on the bail bond premium receipt.  Funds were provided for the bail bond premium to Gevorkyan, for the benefit of Bogoraz and his wife Gevorkyan. (Exhibit 3,4)  This premium amount is in excess of statutory maximums. (Exh, 3,4)

After the promise to provide a bail bond was obtained from defendant it was provisionally filed with the Court.  At that time Bogoraz was in custody, had been in custody from the date of his arrest, and remained in custody.  He continued to remain in custody at all times from his arrest through today, and was never released on bail.

Until or unless Bogoraz was released from custody, the bail bond was never in jeopardy, never at risk, nor did it secure any event or conduct such as the return of a criminal defendant to court for court proceedings. Whether the bond actually existed, until Bogoraz was released from

---

[1]  $ 120,560  is not supportable even on defendant's negligent calculation.  It is not only the wrong amount (correct amount is $ 120,260) but it is even larger than  doubling ($120,520)   It is simply a random number.

custody, the court lacked any power to order that the bail bond be forfeited or seized by the government. It was never at risk until and unless Bogoraz was released from custody.

Bogoraz has been in continuous custody from the date of his arrest.  He remained in government custody pending a bail bond source hearing. Bogoraz remained in custody and was never released on bail, and today remains in custody.

The Bail Bond never secured any event, much less the return of Bogoraz to Court, nor was it ever accepted in lieu of cash bail because Bogoraz never left the custody of the Government.

A first surety hearing was held in Criminal Term, Supreme Court, Kings County before Justice Firetog.  He denied the surety and wrote "Denied" on the first bond. (Exhibit 11,12)

A second bond was prepared by Defendant, and further affidavits, with additional guarantors were prepared.  A second surety hearing was held.  Notably, no additional charge was assessed by Defendant, and he did not claim any new fees for the provision of the second bond. Defendant's argument that the mere "posting" of the bond prior to a surety hearing entitled him to the entire $ 120,560 fee is belied by the failure to seek a new premium fee for the second bond.

Plaintiff Arthur Bogoraz pled guilty to crimes relating to the indictment on June 25, 2013. Between the day of his arrest and his plea of guilty, he never left the custody of the Government, nor was he released from that custody, nor was he granted release on bail.  At no time was his obligation to return to court ever secured by any form of bail, either cash or bond. He is not now subject to release on bail, and was never released on bail under this indictment.  During this entire period of time Plaintiff remained in custody.   He was never freed on bail, and neither the bail nor the bail bond was ever at risk through today.

Defendant is licensed as a bail bond agent by the Insurance Department of the State of New York.  He issues the bonds as "attorney-in-fact" for the International Fidelity Insurance Company.  He represents the International Fidelity Insurance Company, and specifically did so in this bail bond transaction.  (Exh 11,12)

The terms of the indemnity for a bail bond were written and printed by Defendant.  The terms of the indemnity agreement specifically used the term "unearned premium" and cited examples of when the premium was earned and when it was unearned.  Defendant admitted that he was bound by the terms of the indemnity agreement.  Under certain circumstances, Defendant and the International Fidelity Insurance Company admitted that premiums were unearned and must be returned to the client.

Neither the bail, nor the bail bond could be at risk unless Plaintiff was released subject to bail. Plaintiff Arthur Bogoraz was never released subject to bail, and would never be released subject to the bail bond. Defendant took physical possession of various forms of security, in addition to the premium paid for the bail bond.  Defendant took physical possession of four current genuine U.S. Passports including those of Karine Bogoraz, Leonard Bogoraz, Galina Bogoraz and Fred Bogoraz.  The passports were not returned until an in-Court transfer in this case in January, 2014.

Neither Plaintiff Arthur Bogoraz nor any plaintiff benefited from the bail bond because Bogoraz was never released on bail. Neither the bail bond, nor the underlying security, nor any bail money was ever "at risk."  Because neither the bail, nor the bail bond, nor the collateral was ever "at risk" then the premium was never earned, nor at risk. A condition precedent to utility, effectiveness or application of a bail bond securing the release of a criminal defendant is that the criminal defendant be released subject to bail, security for which is the bail bond.

4

Plaintiff  demanded the return of the premium paid for the bail bond on the basis that the bail bond was never "at risk" nor was any sum of money for bail "at risk," because the bond premium was not earned, nor was there ever a situation in which Plaintiff was granted release on bail, nor could the bail bond ever have been subject to possible loss, because the conditions precedent to the bail or the bail bond premium never arose. Plaintiff demanded the return of the passports four times along with all other collateral which were given to defendant and which he has retained. Defendant s refused to return either the bail bond premium or any of the items held as collateral until January 27, 2014.  Until that time defendant maintained dominion and control over the passports to the detriment of plaintiffs.  Defendant maintained dominion and control over the passports and plaintiffs were not permitted to possess or control their own passports up to and including January 27, 2014.

1. <u>Plaintiff's Exhibits</u>

    1.       Empire Bonding Agency Bail Bond Receipt 52507

    2.       Lazzaro Law Firm, P.C. letter 3/15/12

    3.       Judelson Bail Bondsman Premium Receipt 05486

    4.       Judelson Bail Bondsman Premium Receipt 027057

    5.       Attorney General letter dated August 15, 2013

    6.       Power of Attorney IS2M-1294

    7.       Undertaking of Bail dated March 28, 2012

    8.       Undertaking of Bail dated March 28, 2012 (stamped)

    9.       Bail Affidavit dated March 28, 2012  (page 1)

    10.      Bail Affidavit dated March 28, 2012  (page 2)

    11.      Bail Affidavit dated March 28, 2012  (page 1) Marked "Denied"

12.      Bail Affidavit dated March 28, 2012  (page 2) Marked "Denied"

13.      Application and Indemnity for Bail Bond - Front

14.      Application and Indemnity for Bail Bond – Rear

15.      Application and Indemnity for Bail Bond – Rear, enlarged

16.      Transcribed excerpt from Application and Indemnity for Bail Bond – Rear

17.      Bail Affidavit, April, 2012, 4pp.

18.      Bail Affidavit, April 4, 2012 "Amended"

19.      Bail Affidavit April, 2012  p.5

20.      Allegheny Casualty International Associated Bond Invoice No. 5002648

21.      Transcript of Proceedings, April 19, 2012 in Peo. v. Bogoraz  3pp

22.      Allegheny Casualty International Associated Bond letter dated August 5, 2013

23.      Allegheny Casualty International Associated Bond letter dated August 13, 2013

**Hearsay**

Prior to the day of trial, Plaintiff objected to portions of defendant's direct testimony. Those objections are repeated here.  The trial testimony is limited by this Court's order to affidavits filed for the bench trial.  The Judelson affidavit (Docket 36) contains his recounting of statements made by persons who will not testify at trial, and for whom no affidavits were filed.

1.      Paragraph 22.  There he quotes "the Attorney" "stated he would go to the Appellate Division and he wanted his objection noted."  This is an oral assertion offered in evidence to prove the truth of the matter asserted.  It is Hearsay as defined by Fed. R. Evid. 801.

Hearsay is not admissible except as provided by the rules.  Fed. R. Evid. 802.  No exception applies to this statement.

2.   Paragraph 30.  Mr. Judelson quotes Judge Chun in an ex parte meeting with Mr. Judelson. This is an oral assertion offered in evidence to prove the truth of the matter asserted.  It is Hearsay as defined by Fed. R. Evid. 801.  Hearsay is not admissible except as provided by the rules.  Fed. R. Evid. 802.  No exception applies to this statement.

3.   Paragraph 33.  Mr. Judelson quotes 'a lawyer" in a telephone conversation with Mr. Judelson. This is an oral assertion offered in evidence to prove the truth of the matter asserted.  It is Hearsay as defined by Fed. R. Evid. 801.  Hearsay is not admissible except as provided by the rules.  Fed. R. Evid. 802.  No exception applies to this statement.

4.   Paragraph 34.  Mr. Judelson quotes Anna Lembersky in an ex parte meeting with Mr. Judelson. This is an oral assertion offered in evidence to prove the truth of the matter asserted.  It is Hearsay as defined by Fed. R. Evid. 801.  Hearsay is not admissible except as provided by the rules.  Fed. R. Evid. 802.  No exception applies to this statement.

5.   Paragraph 36.  Mr. Judelson quotes an unnamed source in the Department of Insurance and a conversation with Mr. Judelson. This is an oral assertion offered in evidence to prove the truth of the matter asserted.  It is Hearsay as defined by Fed. R. Evid. 801.  Hearsay is not admissible except as provided by the rules.  Fed. R. Evid. 802.  No exception applies to this statement.

6.   Paragraph 38.  Mr. Judelson quotes the AG's office (presumably the Office of the Attorney General)  in an conversation with Mr. Judelson. This is an oral assertion offered in evidence to prove the truth of the matter asserted.  It is Hearsay as defined by Fed. R. Evid. 801.

Hearsay is not admissible except as provided by the rules.  Fed. R. Evid. 802.  No exception applies to this statement.

**Parol Evidence**

The parties entered into a written contract for the provision of a bail bond.  (Exhibits 13-14) Application an Indemnity for Bail Bond.  "Where the parties have reduced their agreement to writing, the parol evidence rule excludes evidence of any prior oral or written agreement, or of any contemporaneous oral agreement when offered to contradict, vary, add to or subtract from the terms of the writing." Prince, *Richardson on Evidence,* 11th ed. 1995 at 741;  *Marine Midland Bank v. Thurlow,* 53 NY2d 381 (1981); Restatement of Contracts § 213.

"The parol evidence rule is more than a rule of evidence; it is a rule of substantive law which defines the limits of the contract." Id at 741.  *Fogelson v. Rackfay Const.,* 300 NY 334 (1950).

The parol evidence rule excludes evidence of prior understandings and negotiations that contradicts the unambiguous meaning of a writhe, which completely and accurately integrates the agreement of the parties. *Garza v. Marine Transport Lines, Inc.,*861 F.2d 23 (2d Cir, 1988).

Defendant offers his own interpretation of when the premium for a bail bond is earned by the bail bondsman. He posits that it is earned at the instant that the Court considers the bond whether or not the Court grants bail.  This position is at odds with the plain meaning and wording of the contract of indemnity between Plaintiff and Defendant. That contract of indemnity, with the terms found on the back, are the sole terms of an agreement between Plaintiff and defendant.  Defendant and the insurance company which underwrites his bonds are the author of that agreement, and any ambiguity in the agreement must be construed against the author. Under New York law, an insurance policy is a contract "which, like any other contract,

must be construed to effectuate the parties' intent as expressed by their words and purposes."

*Uniroyal, Inc. v. Home Ins. Co.*, 707 F.Supp 1368 (E.D.N.Y., 1988) citing, *American Home Products Corp v. Liberty Mutual Insurance Co.,* 565 F. Supp. 1485 *aff'd as modified*, 748 F.2d 760 (2d Cir. 1984). *See also Breed v. Insurance Co. of North America*, 46 NY2d 351, 355 (1978); *Hartford Accident & Indemnity Co. v. Wesolowski*, 33 NY2d 169, (1973); *McGrail v. Equitable Life Assurance Society*, 292 NY 419 ( 1944). If the policy is unambiguous, its interpretation is strictly a question of law for the court. *Caporino v. Travelers Insurance Co.*, 62 NY2d 234, 239 (1984); *Hartford Acc & Ind*. v. *Wesolowski* , 33 NY2d 169 (1973)  at 172 ("the courts have declared on countless occasions that it is the responsibility of the court to interpret written instruments. . . . This is obviously so where there is no ambiguity.") *Board of Education v. CNA Insurance Co*., 647 F. Supp. 1495, 1502 (S.D.N.Y. 1986).

**The Law of Contracts as it
Applies to Insurance Contracts**

In the contract between Plaintiff and Defendant, it is agreed that Defendant will "execute or procure the execution of a bail bond, or undertaking in the sum of $ 2,000,000 on behalf of Arthur Bogoraz, Defendant." (Exhibit 13).  No specific sum was set for Karine Bogoraz to pay as indemnitor.

It is well settled that the elements of a contract are offer, acceptance, consideration and performance.  In this case, because the bond which insured the return to court of a person who never left the custody of the government, there was and could not be any performance.  Until the prisoner was released upon bail, it was impossible for performance to take place.  When there is impossibility of performance, the consideration must be returned to the offeror.

There is no specific time or act which triggers the earning of the premium set forth in the agreement.  In the agreement it is agreed that portions of the premium remain unearned until the

end of the case.  This portion of the premium must be returned to the indemnitor under the circumstances set forth in paragraph Fifth.

Defendant is both a person "doing a bail business" as well as "doing an insurance business."  NY Insurance Law § 6801.  Only insurance companies and persons associated with them may act as an agent or solicitor concerning bail. NY Insurance Law § 6802.  The premium or compensation for giving bail bond shall not exceed ten per centum of the first three thousand dollars, and eight percentum of the excess amount over three thousand dollars up to ten thousand dollars and six percentum of the excess over ten thousand dollars. NY Insurance law § 6804.  "No  person or corporation shall (1) change or receive, directly or indirectly, any greater compensation for making a deposit for bail or giving bail, or act in such business as aforesaid without obtaining a license."  The correct premium for a bond of $2 Million is $ 120,260, not $120,560.

Plaintiff paid a "premium" set forth by the Agreement of Indemnity.  The Agreement of Indemnity recognized that a "premium" is either earned or unearned, depending on the bail status of the defendant.  (Exhibit 14, "Fifth")  It specified "That the Company shall have the right at any time, and for any reason satisfactory to it, to surrender the principal of the bond, but it shall thereafter return the unearned premiums."

Plaintiff overpaid the statutory rate of premium based upon Defendant's negligent (or intentional) calculation.  The sliding rate of premium give a greater compensation to the first $10,000 of bail.  That greater rate of compensation is not repeated (as defendant testified) on the second million.  By negligence or intention, Defendant demanded and collected a premium in excess of the statutory amount.  He collected $ 120,560 when the statutory maximum was $ 120,260.

The Agreement of Indemnity (Exh. 13,14,15)  further provided that "In the event of the failure of the principal of the bond to appear in court, or at the office of the Company whenever so required, or in the event of the re-arrest of the principal on another charge, or on the same charge with an increase of bail, or when the case against the defendant be reached for trial, or in the event of the failure of the undersigned to comply with the covenant of this agreement, the Company shall have the right to surrender the defendant without the return of any portion of the premium."[2]

Insurers who take premiums in exchange for the provision of insurance coverage do not earn the entire premium until the term of the insurance coverage period ends.  As an example, consumers who took vehicle loans and had to obtain insurance covering the loan were entitled to a refund of unearned premiums when they terminated the loans by paying them off early. *Hansen v. Monumental Life Ins. Co.,* 2008 US Dist Lexis 112254.  The reasoning is that if there is no risk to insure, then no premium can be earned.  If the loan is paid off early, there is no longer any risk, and the carrier must return the unearned portion of the premium.  It is unearned from the early payoff to the end of the term.  It is earned from the beginning of the term to the early payoff.

A similar example arises when the insured homeowner prepays a premium for an extended term and then sells the house prior to the end of the term.  The carrier must return the unearned premium.  *Home Mut. Fire Ins.Co v. Hosfelt,* 233 F.Supp 368 (D.Conn, 1962). Another example exists where an insurer pays off a total loss and then refunds the unearned premium for the balance of the term.  *No Hero Enters. B.V. v. Loretta Howard Gallery Inc.,* 20

---

[2]  Defendant's position that the premium is absolutely earned earlier than either of the two conditions set forth in the Agreement of Indemnity is conclusively undercut by his very language and conditions in the Agreement of Indemnity.

F.Supp 3d 421 (SDNY, 2014).

Unearned premiums are payments for insurance where no risk existed.  The person who prepays for home insurance to prepare for a closing will have the premium refunded if the sale does not close.  The person who prepays a year's premium for car insurance will have the unearned premium returned if the car is stolen, or destroyed, or sold before the end of the term, and the plaintiff who pays for a bail bond which is never applied to a released defendant should have the premium returned to her as "unearned."

**The terms of this particular bail bond**
**agreement between Plaintiffs and Defendant**

The sole writing which sets forth the terms of the bail bond contract between plaintiff and defendant is exhibit 13/14.  This Agreement of Indemnity wholly supports Plaintiff's position, and completely contradicts the enunciated position of Defendant.  Remembering that the terms of this agreement are construed against the insurance company/bail bondsman, it is abundantly clear that the work "post" or "posted" does not appear anywhere, nor does defendant's enunciated position have any support in the documents.

The Agreement of Indemnity does not state when the bail bond premium is earned, and does not specify that it is earned upon any particular circumstance.  It does not state that the premium is "non-returnable" or "nonrefundable" or won't be refunded.  In fact, it says just the opposite.

The front of the exhibit does not state any contract provisions.  The rear of the exhibit, "Agreement of Indemnity" sets forth the only terms of the insurance contract between Plaintiff and Defendant. (Jabr Deposition Transcript, p.17, Tr. 125, Exh. 14,15)  Most tellingly, it sets forth the terms "unearned premium" and details circumstances in which the bail bondsman or

12

insurance company must refund a portion or the whole of the premium.

Section FIFTH describes a situation in which the insurance company must refund "unearned premium" if it surrenders the principal of the bond.  It contrasts this requirement to refund all or a portion of the unearned premium if the indemnitor or the principal fails to adhere to certain standards of conduct. The conduct set forth requires that the prisoner had been released on bail. (Exh. 15)

This FIFTH covenant is directly at odds with the position taken by the defendant in which he argues that under no circumstances need he ever return any portion of the premium, whether or not the prisoner was released on bail. These two situations cannot be squared nor can one be true if the other is true.

The written terms of the only contract between Plaintiff and defendant set forth the unescapable conclusion that (1) the premium must be earned through risk; (2) That under certain circumstances the whole or a portion of the premium must be returned to the indemnitor; and (3) that there is no situation in which the bond is earned upon the mere posting of the paper to the Court prior to the release of the prisoner.  The contract, called an Agreement of Indemnity, must be construed against Defendant, its author.  The contract fails to set a specific event as the s*ine qua non* of the bond premium being fully earned.  The contract sets forth two situations in which there are "unearned premiums" and one in which the unearned premium must be returned to the indemnitor after the release of the prisoner on bail.

Defendant's construction of the agreement that once he presented a paper to the judge the premium was earned, and need not be returned cannot be squared with the specific language of the sole contract.

**Statutes Concerning bail and bail bonds**

In New York, the business of bail bonds is controlled by N.Y. Insurance Law Article 68. There are but 5 sections in that Article.  The first (6801) sets forth the definition of the Bail Bond business.  Mr. Judelson fits squarely within that definition.  He must be licensed.  It does not deal with premiums or when they are earned.

Section 6802 deals with Professional bondsmen, and describes the requirements of a license.  It does not deal with premiums or when they are earned.

Section 6803 discusses bail bond businesses in cities of a certain size.  It does not deal with premiums or when they are earned.

Section 6804 deals with the statutory table of premiums and states that the premium may not exceed 10% of the first $ 3000 along with 8% of the next $ 7000 along with 6% of any amount over $ 10,000.  No person shall charge or receive any greater compensation for the act of making a deposit for bail or giving bail.  The section does not deal with when the bail premium is earned.  It does not mention "posting" nor the concept that the premium is earned upon the presentation of a paper to a judge. This statute sets a bail bond premium of $ 120,260 for a bail bond of $2 Million, not $ 120,560.

Section 6805 deals solely with Charitable bail organizations, of which Mr. Judelson is not a member.  The section does not deal with when the bail premium is earned.

No section of the New York Insurance Law supports Defendant's position.

Section 520 of the New York Criminal Procedure Law (CPL) discusses bail and bail bonds.  This section describes the submission of a bail bond along with a justifying affidavit. CPL § 520.20.  It describes the submission of a document which is later "to be posted."

CPL§ 520.20(3) suggests that a bail bond is posted only after it is accepted by the Judge

14

and the prisoner is released on bail.  "A bail bond posted in the course of a criminal action is effective and binding upon the obligor or obligors until the imposition of sentence or other termination of the action, regardless of whether the action is dismissed in the local criminal court after an indictment on the same charges…unless prior to such termination such order of bail is vacated or revoked or the principal is surrendered."

The use of the term "surrendered" harks back to the FIFTH covenant of the Agreement of Indemnity.

CPL Section § 520.30 states that at the conclusion of the inquiry (surety hearing), the court must issue an order either approving or disapproving the bail.

The CPL does not discuss when a bail bond premium is earned, and does not couple the "posting" of a bond with the earning of a premium.

**Proposed findings of Fact**

1.     Premiums for the act of making a deposit for bail or giving bail are regulated by New York Insurance Law Article 68.

2.     No person who is not licensed pursuant to New York Insurance Law Article 68 may charge for the act of making a deposit for bail or giving bail.

3.     Defendant is licensed and is permitted  to charge fees for the provision of a Bail Bond which is actually accepted and where the prisoner is released on bail.

4.     The premium which is permitted  by Insurance Law § 6804 is the sole charge that may be made or obtained for the act of making a deposit for bail or giving bail.

5.     That permission or authority derives solely from New York Insurance Law § 6804 which sets forth  the statutory table of premiums and states that the premium "may not exceed 10% of the first $ 3000 along with 8% of the next $ 7000 along with 6% of any amount over

$10,000.  No person shall charge or receive any greater compensation for the act of making a deposit for bail or giving bail."

6.      Despite the clear language of this statute, Defendant overcharged Plaintiff. Defendant charged Plaintiff the sum of $ 120,560 (Tx. 26:21).  This amount was in excess of the amount permitted by statute.  The amount permitted by statute for a $2 Million bond was $120,260.   The overcharge was intentional, and exceeded the statutory amount permitted. (Exh 3,4)

7.      The overcharge took place because Defendant intentionally or negligently overcharged Plaintiff.

8.      Defendant testified that he merely doubled the fee for $1 Million dollars ($60,260) instead of correctly calculating the actual permissible premium fee.  (Tr. 117-119)

9.      Even that testimony was incorrect because Defendant did not charge $120,520. Instead he charged $ 120,560.

10.      Defendant, through his Insurance company, then billed Plaintiff for further costs and disbursements in the amount of $ 172.00  (Ct. Exh 3, Tr. 135-7, P's Exh. 20)

11.      This additional charge was in violation of New York Insurance Law § 6804.

12.      New York Insurance Law § 6804 prohibits the seeking of compensation larger than that set forth in the sliding scale for the act of making a deposit for bail or giving bail.

13.      Defendant disclaimed knowledge of this charge, but testified that the charge was made by  his insurance company (AIA) for which he was attorney in fact and agent.  (Tr. 136)

14.      This bill was admitted as Court Exhibit 3 (Tr. 135).

15.      This bill constitutes a second additional prohibited act of charging an excessive fee for the making of a deposit for bail or giving bail in excess of the statutory limits.

16.     Defendant was an agent for the International Fidelity Insurance Company, for which he was also attorney-in-fact.  He collected, and permitted collection of fees for various activities that are not permitted by the sole statute which governs fees for the provision of bail bonds.

17.     Defendant or his insurance company wrote and prepared, or offered and utilized all documents that Plaintiffs were required to sign in the bail bond procedure.

18.     Defendant or his insurance company authored or utilized the Application and Indemnity for Bail Bond, front and back, which were received into evidence as Exhibits 13,14,15.

19.     Defendant submitted the Bail Bond Affidavit to the Court for its approval.

20.     Supreme Court, Kings County Criminal Term denied the Bail Bond Affidavit – Application and did not release Plaintiff Bogoraz at any time. (Exh. 11/12)

21.     The sole contract between Plaintiffs and defendant is the Application and Indemnity for Bail Bond (Exh. 13,14,15).

22.     This sole document (back and front) supplied all terms and conditions for the transaction of a bail bond premium and the provision of a bail bond to the Court to ensure the release of Bogoraz, and to insure his compliance with direction of Supreme Court, Kings County, Criminal Term, and his return to court for court ordered appearances.

23.     That document was authored by Defendant, or obtained, proffered and utilized by Defendant.

24.     That document discusses "unearned premiums" and "earned premiums" on the back of the front and back document (Exhibit 14,15)

25.     The document acknowledges that under certain circumstances the bonding

17

company must return portions or the whole sum of the premium payment to the client who has

paid the premium to the agent or insurance company.

26.     The document acknowledges that under other circumstances, after the prisoner

has been released, no portion of the premium must be returned.

27.     No portion of the sole agreement between the parties in this bail bond business

relationship defines when and how the premium is earned.

28.     There is no statement that the premium is earned upon "posting" the bond.

29.     There is no definition of what it means to "post" a bond.

30.     There is no language which defines how and whether a bond premium is earned.

31.     There is no language which defines whether a bond premium must be returned to

the bond premium payer.

32.      Mr. Jabr testified that the sole contract between Plaintiffs and Defendant was

signed and notarized in Newark, New Jersey. (Tr. 92-93).

33.     Mr. Jabr testified that he notarized the Application and Indemnity for Bail Bond

while he was in Newark, New Jersey. (Exh. 13,14,15)

34.     That exhibit bears the notarization of Yusef Jabr, which states that he is Qualified

in New York.  It does not state that he is qualified in New Jersey.

35.     The sole contract between Plaintiffs and Defendant was not notarized in New

York, and the signatures as well as the actual notary stamp on the document was taken and

stamped in New Jersey.

36.     Mr. Jabr testified that the premium was taken and kept, and not returned in 6-10%

of the bail bond cases handled by Defendant even when the prisoner is not released on bail.

37.     Defendant testified that he has personally kept over a hundred premium payment

even when the prisoner was not released upon bail. (T. 142, 143)

**Damages**

      Plaintiff has been damaged by the refusal to refund the unearned premium for the bail

bond in the full amount of $ 120,560 along with the additional charge of $ 172, along with pre-

judgment interest from the date of March 27, 2012 along with attorney fees in this action.

Dated: New York, New York
       May 4, 2015

_____
      Andrew Lavoott Bluestone
      233 Broadway, Suite 2702
      New York, NY 10279
      (212) 791-5600